Mr. McPherson, I believe you're at bat first. Good morning, Your Honor. Donald McPherson for Mr. Jamal, to please the Court. And I think the Court's aware that we will split up four ways. I will try to take four minutes and reserve one for rebuttal. No, I have not listened to the entire tape. That's the words of the prosecutor. As to the tape that was introduced, and by listened, of course, it's in Arabic. It means read the English translation, the transcript. That's just an example as to one tape that was introduced in evidence. The record clearly shows there were thousands of tapes in this case due to the FISA wiretap. The government has not as much as listened to those tapes to make a Brady determination. Thus, one of the threshold issues in this case is how in the world could counsel for my client, properly defend my client if the government hadn't met its obligation under Brady, and then likewise under the SIPA doctrine my client did not have access to these classified, the classified information that the attorney got his secret clearance, reviewed the information. My client was not entitled to it. The government has not as much as attempted to respond to either one of these issues, Brady and SIPA, in their response brief. Thus, they've waived it. In our opening brief, we made. Yes, Your Honor. You said they haven't listened to the tapes. Are there summaries or transcripts of the tapes? They did not even have summaries done of all the tapes. And they take the position that they satisfy their Brady, well, I don't know what position they take since they didn't respond to Brady in their response brief. So I'm assuming they take their position that, well, summaries are enough. If you look at the transcript, and I've cited from that transcript in part at page two of my reply brief, you see what I've called a cavalier attitude. They're saying we don't even have to review the entire tape that we're introducing into evidence. We can rely on the interpreter and rely on the witness who heard some of this conversation for the proposition that there's no Brady. Let me ask you something. As a purely practical matter, Mr. Jamal knows what he was talking about. As I understand your argument, it turns on the supposition that because he didn't say anything exculpatory in those bracketed four minutes on either side, that that's exculpatory, but it's not. No, that's not my position, Your Honor. My position is the government has an obligation under Brady to review the evidence. If they decide under FISA to wiretap for a year and a half. They have an obligation to disclose anything that is material and exculpatory. How do they know unless they've reviewed it? Okay. Your client was the subject of the tape. Your client knows what he talked about. Is there any hint anywhere in the record that any part of the four minutes on either side is exculpatory, other than the fact that he didn't say anything that got him in trouble in that four-minute segment on either side? There's nothing in the record that would support that position, Your Honor. Okay. And that's not the position we're taking. We're taking the position that, as I said in my reply, the government made its bed and must lie in it. The government decided to conduct this wiretap operation for a year and a half. They can't willy-nilly, three stooges, close my eyes, I can't see, I can't see. And not review tapes. It's the same. What if they have a thousand documents? Can they say, oh, there's too many documents in this box? We don't have the time to look at all those documents. No. The Brady document says they have the obligation to review under Brady all the evidence that they've collected. That's the simplest issue in the case, I think. That's the one that's a tip of the iceberg as to everything else that's going on here. But it seems it's the simplest one that the Court needs to decide, do they have an obligation to review all these tapes, whether English, Arabic, or any other language, the same as any documents? And I think they've got this cavalier attitude that, well, we don't have time for that. The record makes clear that they collected thousands. They didn't prepare even summaries. And I would challenge counsel when he comes up here to explain to the Court how many they've collected, which ones they prepared summaries on. And the problem with the summaries is the court, the district court hit on this. They hit the nail on the head, but then it just went by the wayside. The district court said, wait a minute, you've got an interpreter listening to this and then making a summary. You're relying on an interpreter, not an attorney. I mean, it's clear we understand your argument. And you have now used up more than five minutes. So if you want to share with counsel, perhaps we ought to hear from Ms. Hinchcliffe. Thank you, Your Honor. Good morning. My name is Nancy Hinchcliffe, and I'm an attorney from Phoenix, Arizona. And I represented one of the four defendants in this case, Muneer Daly, at trial. And I'm also representing him now in this appeal. And as the Court is aware, I've raised two issues in this case. And, of course, I need to talk about the new case that has been decided on Bonn Bonk, Heredia. But before I do that, I just want to give a little factual background very briefly. My client was a shoplifter. That's how he was portrayed throughout this case. In fact, I think probably as one, as an objective person, as you read the record, you don't know what in the heck was this person doing in this particular trial. I mean, a shoplifter who was part of a conspiracy. I mean, that's the problem with it. And that's true, Your Honor. I'm not saying anything to the contrary. That's how he was tied into the conspiracy, was he was a shoplifter. He stole baby formula on occasion and sold it to one of these warehouse men. And that's the factual pattern in this case. Now, the two issues that have been raised by myself on his behalf are the Jewell instruction issue and also the motion to sever issue. At the time he was a shoplifter, he knew he was taking stolen goods and putting in part of the conspiracy. So even if there were error, what difference does it make? That's a very good question. The difference, I think, is this, and I am answering your question. Number one, and you may have just put this into your question, it was inappropriate, I think, because the posture of this case was my client either, if you shoplift, you either know that you're doing the shoplifting or you don't. And he had made one other fact that I need to bring to your attention and remind you of, is the fact that he had, he had, it also came into evidence that there was a confession. And in the confession, he said that, yes, I shoplifted, but 50 percent of the stuff that I sold, the baby formula that I sold, was, in fact, a shoplifted baby formula. The other was not. Now, in terms of what difference does this whole thing make, it seems to me, Your Honor, based on the facts of this case, that because this instruction was so confusing in this regard, that the jury may have ignored the fact that some of the items that he was sold, that he sold, in fact, may have not been stolen property. And that maybe because of the way that the instruction is worded, that maybe, in fact, what happened here was the jurors felt that he was being deliberately ignorant of what was going on, not just in terms of him selling, he himself selling the stuff. And I guess maybe it wasn't error at all. Well, I think it, I think it was error, Your Honor, I think it was error. Now, and let me just say why I think that, and then I'm going to get off this particular issue, because I'm aware of the case. I just wanted to make it clear to the Court, at the time I cited the old Heredia case, or Heredia case, was I think August 7th was when I filed the brief, and there was no indication yet that the case had gone up for any kind of en banc hearing, and therefore this has all happened after the opening brief was filed, and I wanted to make that point clear. One other point I want to make, and that is, and I realize what the holding is now in Heredia, and I'm not going to repeat it all, because I know you're all very familiar with it, but I want to make it clear that my arguments that have been made here, including the ones about that there's really a lesser burden, if you will, placed on the government, I want those arguments to remain. I realize that this Court can't do anything about it because of the decision. Everything you've put in writing is preserved. All right. Thank you. The other issue, the other issue that was raised by myself, of course, was the motion to sever, and it's a very lengthy argument. Maybe it's too lengthy, maybe it's too repetitive. Kennedy, we've read these briefs carefully. Yes. And I think it sets forth fairly accurate, I understand that, Your Honor, and I just wanted to say that I'm about to sit down and shut up. I just wanted to point out that I think I've been very specific about what went on there, and I know that one of the other counsels is going to specifically discuss that issue with you. Thank you. Thank you, Ms. Hinchcliffe. Ms. Hamilton? Good morning. My name is Mrs. Hamilton, and I'm an attorney from Phoenix also, and I represent Appellant Al-Jamal. I'm going to be submitting Mr. Al-Jamal's case based on the written record that's before you already, but I would like to discuss just very briefly one issue that I was concerned about in this case, and that was the motion to sever argument. I frankly feel that Judge Martone, although a first-rate judge, did err in this case in not granting the pretrial motions to sever as well as the various motions to sever that arose during the course of this trial. In this particular matter, Mr. Al-Jamal requested severance because of death threats that had been allegedly made by Mr. Jamal, prior bad acts allegedly made by Mr. Al-Rawi, and alleged other prior criminal acts of Mr. Jamal. But the most important issue that I'd really like to focus on was the problems presented by Mr. Jamal's trial counsel, Mr. Kavanaugh. Now, we understand that Rule 14 sets a very high bar for a severance during a trial, and that would be of demonstrable prejudice. In this particular matter, we're claiming error not merely because Mr. Kavanaugh, co-counsel for Mr. Jamal, was less than a minimally adequate attorney and was unskilled as a defense counsel. It is not merely that he stumbled through the case. No, it is rather that his cross-examination, his presentation of witnesses and evidence became antagonistic to my client, as well as to the other co-defendants in this matter. And when he became antagonistic to the other co-defendants, that's when he stepped across the line, and that's where we believe we have the demonstrable prejudice. It is a rare case, I think, where we read trial transcripts where our district court judge, in referring to various ideas presented by Mr. Kavanaugh in way of presentation of evidence, would say something like, that's the stupidest thing I've ever heard. You don't often see that in a record. Or you don't often see the AUSA who's just about to have a stroke and that the defense attorney is going to step into it big time and it's just going to mess up the case something terrible. And I included a few pithy quotes from Judge Martone about stupid errors and also from the co-counsel, Mr., Mr., I'm losing my mind here, Mr. Kemp, who also had a few things to say about the fact that Mr. Kavanaugh wanted to bring in evidence about 9-1-1 and wanted to bring in evidence about terrorism. And I wanted to ask key questions about how our clients related to the hijackers from 9-1-1, and everybody's just having a fit when he's talking about this. And that's just one small example of this fellow didn't have a clue. He shouldn't have been doing a case of this magnitude. Frankly, Judge Martone could have perhaps given him a mentor attorney to assist him or devise some other remediating effort to help this case go along. But the bottom line was when the dust settles, my client, as well as Mr. El-Rawi and Mr. Daley, were denied a fair trial because of the way Mr. Kavanaugh handled the case and messed it up, frankly. And so I'll just sit down at this point. Thank you. Thank you, Ms. Hamilton. Ms. Peretti. Good morning, Your Honors. May it please the Court. My name is Michelle Moretti, and I represent Ibrahim Hassan El-Rawi. He was an Egyptian petroleum engineer from Texas who emigrated to the United States. He had operated a legitimate wholesale business, selling consumer products at home and abroad. Although there was some evidence that he knew Jamal, there was no evidence that linked Al-Jamal or Daley with the conspiracy in this case or the any that suggested that he transported baby formula through Texas or Arizona. Where the government elapsed specific incidents or evidence of his involvement, they sought to introduce evidence of unrelated alleged Texas warehouse burglaries that Mr. El-Rawi was implicated in. These were prior bad acts which were precluded by the rules of evidence. First, they were irrelevant, nonprobative, but also specifically under 404b, which my brief details exclusively, extensively rather, they met none of the criteria. First, the evidence was unreliable. It was presented mainly through snitch witnesses who had benefited from plea agreements with the government and alleged that at some point in the distant past, El-Rawi had mentioned incidents of transporting baby formula. But they could really offer no specifics, no credible evidence, or no corroborating evidence. Furthermore, Pasadena, Texas, Detective Randy Merritt offered no further substantiation. In fact, he undermined the sufficiency of the government's evidence. He participated in the lengthy surveillance of certain Texas warehouse burglaries, and although he uncovered evidence regarding the snitch witnesses Garcia and Rodriguez, Rodriguez, who had been under surveillance for a lengthy period, he never observed El-Rawi in any illegal activity. In fact, only learned of him after finding his name in Garcia's address book. When El-Rawi's Houston headquarters were finally raided, they contained pallets of jeans, perfume, imitation brands of clothing, sunglasses, aftermarket watches, and other items, but only a half pallet of baby formula. Detective Merritt asserted he had no idea where these items came from. He could not attest that they were stolen. None of the goods were confiscated as being stolen, despite two separate searches. And ultimately, Merritt conceded that El-Rawi was indeed in the business of legitimate wholesaling. He could offer no concrete evidence of his involvement in the burglary case. Secondly, the evidence should have been excluded because the incidents were sufficiently not factually similar to the case at Barr. Here, the government stressed that this case was only about baby formula, not about anything else. Yet the Texas burglaries involved stolen goods, primarily clothing goods, cigarettes, and not a formula. But there was a very small amount, and the amount that the Texas burglaries were involved in, the evidence linking the baby formula, was mainly proffered by the snitch witnesses who gave remote testimony that many years back El-Rawi had asked one to transport to another, and it wasn't to a man of Middle Eastern descent. But that's evidence, right? And it's evidence, but scant, not the substantial evidence required for a conviction of this magnitude, where a gentleman has lost, has forfeited several million dollars and is serving 84 months in prison time. The next point is that the Texas burglaries were not similar in modus operandi to the baby formula thefts, which were primarily perpetrated by small-level shoplifters who resold formulas to wholesalers. The evidence regarding the baby formula theft was that shoplifters entered individual stores with tubs and stole individual cans and then resold to large-scale retailers or wholesalers who then resold to retailers. As to the Texas warehouse burglaries that El-Rawi was allegedly involved in, these were relatively sophisticated incidents where the premises surveyed, were extensively watched. Individuals entered through roofs, cut wires, opened facility lines, and then offloaded goods into trucks. It was very systematic, organized, and almost a mission impossible style level heist. So that criteria would of sufficient similarity would not suffice under the 404A. The next point is that the Texas burglaries were not similar in modus operandi to the baby formula thefts, which were primarily perpetrated by small-level shoplifters who resold to large-scale retailers or wholesalers who resold to large-scale retailers who resold to large-scale shoplifters who resold to large-scale retailers who resold to large-scale retailers. Under the conversation regarding transport of baby formula in Texas. Okay. Moving on to the 403, probative prejudice balancing. Moving along is now over time, so just put a summary. Then I would just summarize that the government admitted its reliance on the overly prejudicial evidence to prove the Arizona charges, and even argued that in its closing argument as to money laundering and interstate transportation. Since the allegations had nothing to do with the charges in the instant case and the witness had no knowledge to the acts that gave rise to these charges, there was no probative value. The prejudicial value was great, the error was harmless, and the conviction should be reversed. As to the other arguments, I would submit on the brief. I have one kind of insignificant question, but you forgot your client's name, Elrawi. I can't get out of the spelling of the name. I understand it as Elrawi, E-L-R-A-W-I, in accordance with my conversations with him. And as you look like Elrawi, but he has not corrected me. Okay. Your Honor. All right. Otherwise, thank you. Okay. Mr. Rapp. Good morning. May it please the Court, Kevin Rapp, on behalf of the United States. I will begin with the severance issue. Counsel has not demonstrated a manifest prejudice in this case that would require a separate trial for any of these defendants. I will address some of the points that counsel have made. They have argued that defense counsel, trial counsel for Jamal was ineffective. And this is not the appropriate forum to discuss or urge that type of argument. We frankly do not know why trial counsel took the strategy that he did in this case. But how does that – I don't understand that. The question is whether what he did, regardless of his rationale, whether it had an adverse impact on his non-clients. This isn't a case of his client arguing it. It's being made by a co-defendant who they say were put to great distress and prejudice by the incompetence of another counsel. Why isn't that? What possible reason could he give that would mitigate whatever effect it had on them? That's what the trial judge, district court, has to adjudicate at the time, not some time collateral attack. I understand. If we look at some of the arguments counsel has made that he attempted to interject terrorism into this trial. He wanted to question a witness about a statement that involved terrorism. The judge didn't allow him to do that. When he was going to put his client on the stand, the government wanted to make sure that his client was advised not to make statements regarding terrorism. His client ultimately did not. The one situation that the defense is referring to is a question he asked of a government witness regarding 9-11. If the court looks at the transcript, S.E.R. 178, he does ask this witness, was the climate charged because it was 9-11? If you look at the witness's answers, and the witness's name was Yosama Yacoub, the judge said, I understand what you're talking about. And then when he presses him, he says, well, that wasn't the reason the climate was charged. That was one of the issues that the defense attorneys had with Mr. Kavanaugh's performance. But what we do know from the record is Mr. Kavanaugh filed more pretrial motions than any other defense attorney in this case. He, from trial counsel's viewpoint, he cross-examined each of the government witnesses extensively. He put on 16 witnesses in his defense of his client. The other counsel put on zero. We don't know why he made strategic decisions in this case. And the record, in the government's view, is not fully developed to address that. With respect to the other issues of severance, at every point when there was a piece of evidence that applied to one defendant and not the others, the district court judge gave a diligent and repeated instruction advising the jury to compartmentalize the evidence. And if you look at the jury verdict in this case, they did a quit on three counts. So this was a jury that was looking at this evidence. With respect to Exhibit 463, which the defense has argued extensively in their briefs, this was a piece of evidence that was extensively litigated out of the presence of the jury at S.E.R. 494 through 508. Defense counsel for Jamal was arguing that there was both a Brady material that was not contained within the conversation. Judge Reimer was referring to the four minutes on either side of the conversation that was provided. There was no evidence that was Brady in that. He also argued the rule of completeness. And this was a lengthy discussion, 14 pages of transcript. Then the government attorney played this 14-minute tape and at various points during the playing of this tape stopped the tape and asked the witness question. No time during the extensive litigation over its admissibility and no time during the time that the government was playing this tape did any of the other trial counsel for the other defendants interpose an objection to its admissibility. It was a relevant conversation. It was relevant as to Jamal. The district court judge advised the jury that this piece of evidence was only supposed to be considered as to Defendant Jamal. During the course of that conversation, there was no indications of terrorism. There was no anti-government sentiment. Yes, there were Middle Eastern countries that were mentioned, Syria, Lebanon, Iraq, but only within the context of countries that Jamal desired to do business in. With respect to the accuracy of this tape, because there was much litigation and the defense has raised that in their brief, the defense's own witness, who was a party to this conversation, this was a Jamal Sankari at SER 558. He testified that the piece, the transcript that the government was admitting, had admitted at that point into evidence, was 98 percent accurate, if this was harmless. The evidence in this case was overwhelming. With respect to the issue of jury misconduct, there was no abuse of discretion. This was misconduct that came before all the closings were completed. It involved a juror who had searched the Internet and apparently had this information in their possession as the trial went along, but immediately other jurors had policed this juror, the district court judge. The juror was made an alternate. Yes. Could you come back, because I'm mindful of the time. Would you address the Brady disclosure argument that the counsel opened with on the broader issue of Brady? I will. With respect to the FISA Brady issue, the quick answer is trial counsel had those summaries available to them. Indeed, Mr. Kavanaugh, who other counsels complained about him being deficient in his presentation in this case, was the only attorney who actually became cleared and listened and reviewed those summaries. He had those summaries available to him. The government was not going to substitute their Brady judgment for his. So he had them available to him. Were all of the tapes transcribed and summarized, or some were? All of them summarized. All summarized. All summaries. The tapes as counsel. There were some at some point that were still pending translation, weren't they? And then they came into the mix later. Or was it all, when it was turned over, it was all complete at that point? By the time we commenced trial on March 1st of 2005, all of the tapes had been summarized. And all turned over to Jamal's attorney, Kavanaugh. All made available to him. To all counsel, if they could get clearance. Yes. And the three other attorneys did not get cleared in this case. And so it was Mr. Kavanaugh who admittedly had to come to the United States Attorney's Office because of the sensitivity of the information and had that available to him. But on top of that, the government had agents, the agents who were supervising this particular FISA were instructed that anything that was even remotely relevant to baby formula was to be summarized. And that information was brought to the U.S. Attorney's Office where we had an analyst go through all of those summaries and flag those, again, that were even remotely, that even breathed the word infant formula. And government attorneys sat down with that analyst and explained to them the difference between exculpatory and inculpatory information. Then the two trial counsel on the case went through those flags and determined if there was any Brady material, the government understood its obligation. And if there was Brady material, it would have been disclosed to defense counsel. Getting back to the jury misconduct issue, as the Court noted, the juror that had the information became an alternate, was not part of the deliberation. The information which was discovered before the jury engaged in deliberations, the actual information itself, as the district court noted, was, although not admissible, was cumulative. In this particular case that spanned seven or eight weeks, there were no less than eight cooperating defendants who took the stand. Many of them had entered plea agreements on this indictment or had entered plea agreements on activities related to this particular case. So in the final analysis, that information was cumulative. And, again, as to all four of these defendants, the evidence was overwhelming and the district court made available the opportunity for a hearing from each one of these jurors or some type of wadir of the jurors, and no trial counsel availed themselves of that. With respect to the deliberate ignorance instruction as it applies to defendant Daley, if it shouldn't have been applied, it was harmless in this case, given the fact that the evidence of his involvement in this conspiracy is overwhelming. It is true that he was a shoplifter, but he was an important and critical part of this conspiracy. Indeed, during the course of this trial, there were no less than six episodes of him engaging in shoplifting, not just in Arizona, but all over the country, which was part of this conspiracy. He also used, also signed the disclaimers, but also what was important about defendant Daley was he had actually supplied formula to both Sammy Jamal in Tempe, Arizona, and Mamoon Al-Jamal in Garden Grove, California, and had received checks and money from them. And indeed, in the case of Sammy Jamal, he had received no less than $71,000 in checks. Could you be sure to address the Texas burglaries? I will, Your Honor. There was clear evidence to establish that defendant El-Rawe had been engaged in these prior acts where he was directing Rodriguez and Garcia to burglarize these warehouses. And it is true that some of these warehouses did not involve infant formula, but they did involve stolen products. And Garcia and Rodriguez testified to that's essentially what their business was. They took direction from El-Rawe. He told them in many cases what warehouses to burglarize because he had some inside information, and they did that. They brought the stolen products back to him. And while they were doing that, they observed the whole infant formula scheme going on, shoplifters delivering the infant formula. There was one occasion when El-Rawe directed Rodriguez to burglarize a warehouse filled with infant formula. It was not an inconsequential amount of infant formula. It was estimated that there was approximately $40,000 worth of formula. Is there any evidence that any of that activity was focused on formula or just stolen goods in general? Well, we're at the... In other words, why, you know, you're bringing it into time into an infant formula conspiracy. Because it... You're taking burglaries that are warehouses. Because it demonstrated El-Rawe's, and it is pronounced El-Rawe, I was trial counsel. It demonstrated Mr. El-Rawe's knowledge of stolen property. Stolen property generally or baby formula? Well, stolen property generally and also part of the warehouse burglaries involved infant formula, and indeed Garcia, who he directed to steal a variety of items, infant formula. He directed him to steal infant formula? No, he did not. He did not. These particular acts are very similar to the case of Huddleston, where in that case, the prior bad act involved stolen television sets. The acts that were charged as part of the trial involved Memorex tapes. With respect to the other defendants, there was a limited instruction about this information, the information involving the prior acts of El-Rawe that was supposed to apply only to him. With respect to the suspicious activity report, also another issue urged by Jamal, in that case, the defense had opened the door. They were given a week to consider the evidence, and it was admitted, but this was a situation where the defense attorney had opened the door to that type of evidence. If I may have just a few minutes to sum up, unless there were any further questions from the Court. With respect to those incidents where the jury was instructed not to consider, the district court in this case repeatedly, carefully, and diligently cautioned the jury to consider that evidence only as to a particular defendant, and there was no abuse of discretion. And with respect to the jury misconduct, it happened before the deliberation. The jury was immediately instructed not to consider. That juror did not participate in the deliberations, and ultimately that information was cumulative. There was overwhelming evidence in this case as to all four defendants. The jury followed the instructions evidenced by their acquittal on three counts in this case, which means that they really looked at the evidence in this case and weighed it. I have nothing further. Okay. Thank you very much, all of you, for your argument. The matter just argued will be submitted. The Court will stand adjourned for this session.
judges: Hug, Rymer, Fisher